UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRUSTEES OF THE NEW YORK CITY
DISTRICT COUNCIL OF CARPENTERS
PENSION FUND, WELFARE FUND,
ANNUITY FUND, AND
APPRENTICESHIP, JOURNEYMAN
RETRAINING, EDUCATIONAL AND
INDUSTRY FUND, TRUSTEES OF THE
NEW YORK CITY CARPENTERS RELIEF
AND CHARITY FUND, *and* THE
CARPENTER CONTRACTOR ALLIANCE
OF METROPOLITAN NEW YORK,

                    Petitioners,

          *– against –*

EVERLAST SCAFFOLDING INC.,

                 Respondent.

**OPINION & ORDER**

24 Civ. 1321 (ER)

RAMOS, D.J.:

      Trustees Of The New York City District Council Of Carpenters Pension Fund, Welfare Fund, Annuity Fund, and Apprenticeship, Journeyman Retraining, Educational and Industry Fund, Trustees Of The New York City Carpenters Relief and Charity Fund and The Carpenter Contractor Alliance of Metropolitan New York (collectively, the "Funds," and "Petitioners") initiated an arbitration against Everlast Scaffolding Inc. ("Everlast"), based on Everlast's failure to make payments owed to Petitioners pursuant to a collective bargaining agreement ("CBA"). On October 17, 2023, an Arbitrator issued an Opinion and Award (the "Award") in favor of Petitioners. Doc. 1-15 at 7.

      Now pending before the Court are Petitioners' petition to confirm the Award pursuant to Section 301(c) of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185(c), and Everlast's cross-motion to vacate the Award. Docs.

1, 13.  For the reasons set forth below, the motion to confirm is GRANTED, and the cross-motion to vacate is DENIED.

## I.      BACKGROUND

### A. The Parties, Their Agreements, and The Audit

#### 1.  Parties

Petitioners Trustees of the New York City District Council of Carpenters Pension, Welfare, Annuity, Apprenticeship, Journeyman Retraining and Educational and Industry Funds are employer and employee trustees of multiemployer labor-management trust funds organized and operated in accordance with the Employee Retirement Income Security Act ("ERISA").  Doc. 1 ¶ 4.  Petitioners Trustees of the New York City District Council of Carpenters Relief and Charity Fund are trustees of a charitable organization established under section 501(c)(3) of the Internal Revenue Code.  *Id.* ¶ 5.  Petitioner Carpenter Contractor Alliance of Metropolitan New York is a New York not-for-profit corporation.  *Id.* ¶ 6.  The Funds each maintain principal places of business in New York, New York.  *Id.* ¶¶ 4–7.

Respondent Everlast Scaffolding Inc. is incorporated in New York.  *Id.* ¶ 7. Petitioners state that at all relevant times, Everlast was an employer within the meaning of section 3(5) of ERISA, 29 U.S.C. § 1002(5), and was an employer in an industry affecting commerce within the meaning of section 501 of the LMRA, 29 U.S.C. § 142. *Id.*  Everlast is a contractor that erects scaffolding and sidewalk bridging used for construction.  Doc. 13-1 ¶ 4.

#### 2.  The Agreements

#### a.  Project Labor Agreements

As part of its scaffolding business, Everlast serves as a trade subcontractor for public works agencies such as the New York City School Construction Authority ("SCA").  *Id.* ¶ 5.  For some projects, Everlast hires union employees to perform the scaffolding work pursuant to "project labor agreements" ("PLAs").  *Id.* ¶ 6.  PLAs

require that Everlast use union workers, who are entitled to benefits, and that Everlast pay the benefits directly to union benefit funds, such as the Funds in the instant case. *Id.* However, Everlast also works on non-public work jobs and jobs not subject to PLAs, that is, jobs for which Everlast is not required to hire union workers or pay union benefit funds for workers' benefits. *Id.* ¶ 7. On non-PLA jobs, Everlast pays workers directly. *Id.*

Between July 5, 2018 and February 16, 2022, Everlast executed a series of Affidavits of Project Labor Agreements ("PLA Affidavits") and/or PLA Letters of Assent ("PLA LOAs") for various SCA projects. Doc. 1 ¶ 11. The PLA LOAs bound Everlast to several agreements for construction work for the SCA, the "SCA PLAs," including one covering fiscal years 2015-2019, which was subsequently extended through August 25, 2020, and one covering fiscal years 2021-2025. *Id.* ¶ 12–15. These SCA PLAs required Everlast to "pay timely contributions on behalf of all employees covered by th[e] Agreement" to designated "[legally] established jointly trusteed employee benefit funds." Docs. 1-4 and 1-6, at Art. 11 § 2(A).

Similarly, on February 22, 2021, Everlast executed a PLA LOA for a renovation and rehabilitation project for the Dormitory Authority for the State of New York ("DASNY"), which bound Everlast to the DASNY PLA, that is, the project labor agreement for that renovation and rehabilitation work. Doc. 1 ¶¶ 8, 9. The DASNY PLA, like the SCA PLAs, required Everlast to "pay on a timely basis contributions on behalf of all employees covered by th[e] Agreement" to designated "legally established jointly trusteed employee benefit funds[.]" Doc. 1-2 at Art. 11 § 2(A)).

   *b. Collective Bargaining Agreement and Collection Policy*

Under both the SCA PLAs and the DASNY PLA, Everlast became bound to various collective bargaining agreements with the New York City District Council of Carpenters (the "Union"), including the Independent Building Construction Agreement (the operative CBA), covering the period July 1, 2017 through June 30, 2024. Doc. 1 ¶¶

2, 17; *see* Doc. 1-7 (CBA).  The CBA and documents incorporated thereto required Everlast to pay contributions to the Funds for the hourly work that Everlast's employees performed "within the trade and geographical jurisdiction of the Union."  Doc. 1 ¶ 18; Doc. 5 at 3.

The CBA additionally bound Everlast to the documents, policies and regulations adopted by the Funds' Trustees.  Doc. 1 ¶ 19.  These included the Revised Statement of Policy for Collection of Employer Contributions (the "Collection Policy").  *Id.* ¶ 20.  The CBA and Collection Policy each contained provisions governing the process for the Funds to audit Everlast.  Specifically, the CBA required Everlast to furnish its books and payroll records when requested by the Funds for the purposes of conducting an audit to ensure compliance with the required benefit fund contributions.  *Id.* ¶ 23 (citing Doc. 1-7, Art. XV(1)).  The Collection Policy, meanwhile, provided that "Outside Accounting Firms engaged by the Funds shall periodically review and/or audit the books and records of all the employers bound by or signatory to a collective bargaining agreement with the [Union] or any other agreements under which they are obligated to contribute to the Funds."  *Id.* ¶ 24 (quoting Doc. 1-12, § IV(1)).  It additionally provided:

> If the employer fails to keep sufficient and complete records such that the Outside Accounting Firm is unable to determine the employer's compliance with its obligation to the Funds, or if such records are lost or destroyed, then the burden will be on the employer to prove that contributions are not due and owing for all employees working during the time period under review.

Doc. 1-12 at § IV(5).  Moreover, should an audit determine that an employer underpaid the Funds, the Collection Policy provided that the employer must pay the amount due or otherwise challenge the audit's determination within 14 days of being notified of the underpayment.[1]  *Id.* § IV(7).  It additionally provided:

---

[1] The 14-day period begins on the date of the letter, sent by the Funds to the employer, notifying the employer of the underpayment.  *Id.* § IV(7).

> If the employer challenges the outcome of the payroll review and/or audit, the
> employer shall be permitted to submit to the Outside Accounting Firms additional
> documentation supporting its challenge within the fourteen (14) day period.

*Id.*  Should an employer challenge only part of an audit's determination, the Collection

Policy still required that the employer to pay any undisputed amounts "immediately."  *Id.*

§ II(4).

The CBA and Collection Policy additionally provided for the arbitrability of

disputes.  The CBA outlined the general procedure for, and the broad scope of,

arbitration, as follows:

> Should any dispute or disagreement arise between the parties hereto, or between
> the Union and any Employer signatory hereto, concerning any claim arising from
> payments to the Fund of principal and/or interest which is allegedly due, either
> party may seek arbitration of the dispute before the impartial arbitrator designated
> hereunder by filing a notice of intent to arbitrate in writing with said impartial
> arbitrator, and serving a copy of said notice on the Employer, or the Union, as the
> case may be.  Unless a waiver is mutually agreed to in writing by the parties hereto,
> a hearing shall be convened as soon as practicable and the arbitrator shall submit
> his award within twenty (20) days after the close of the hearing.  **The arbitrator
> shall have full and complete authority to decide any and all issues raised by
> the submission and to fashion an appropriate remedy including, but not
> limited to, monetary damages.  The arbitrator's award in this regard shall be
> final and binding upon the parties hereto.**

Doc. 28 at 3–4 (quoting Doc. 1-7 Art XV § 7 (emphasis added)).  The Collection Policy,

meanwhile, provided:

> The Trustees are empowered to designate one or more arbitrators to serve in
> collection matters.  The Trustees hereby designate a panel of five arbitrators,
> consisting of:  Roger Maher, J.J. Pierson, Steven Kasarda, Jeffrey Stein and Daniel
> Engelstein.  This panel can be changed at any time at the discretion of the Trustees.

Doc. 1 ¶ 22 (quoting Doc. 1-12, § VI(2)).

Finally, whether through an arbitration or a lawsuit concerning unpaid

contributions, the CBA and Collection Policy entitled the Funds to collect, in addition to

the unpaid contributions themselves, interest on the unpaid contributions, liquidated

damages, audit costs, and reasonable attorneys' fees and costs.  *Id.* ¶¶ 25–26 (citing Doc.

1-7 Art. XV § 6, and Doc. 1-12 §§ IV(11), V(4)–(6)).  The Collection Policy provided for

attorneys' fees and costs to be assessed "at the same hourly rate charged to the Funds for such services." *Id.* ¶ 38 (quoting Doc. 1-12 § V(6)).

      *3.  The Audit*

      Pursuant to the CBA and Collection Policy, Petitioners hired an independent outside accounting firm, Novak Francella LLC ("Novak Francella"), to conduct an audit of Everlast (the "Audit"), covering the period of February 1, 2021 through March 27, 2022 (the "Audit Period").  Doc. 1 ¶ 27; *see also* Doc. 23 ¶ 5.

      The Audit report was issued by Novak Francella on February 28, 2023.  Doc. 23 ¶ 8.  It determined that Everlast had "failed to remit contributions to the Funds in the principal amount of $267,551.83."[2]  Doc. 1 ¶ 27; *see also* Doc. 1-13 at 1.

      Petitioners transmitted a copy of the Audit to Everlast on March 10, 2023.  Doc. 24 ¶ 8.  However, in the 14-day period that followed, Everlast failed to pay the outstanding contributions identified in the Audit, and it also "failed to submit any documentation" responding to or rebutting the Audit, to either Petitioners or to Novak Francella.[3]  Docs. 1 ¶ 28, 23 ¶ 9, 24 ¶ 11.

      Petitioners thus initiated an arbitration before Daniel Engelstein (the "Arbitrator"), one of the designated arbitrators under the Collection Policy, concerning Everlast's failure to pay.  Docs. 1 ¶ 29; *see also* Doc. 1-15 at 2.  On April 5, 2023, Petitioners served a Notice of Intent to Arbitrate on Everlast, "seeking the collection of $365,524.60 plus such additional interest liquidated damages and costs accruing thereon."[4]  Doc. 1-15 at 3.

---

[2] Inclusive of interest through February 27, 2023, an "audit cost," and a "20% delinquency assessment," the Audit provided a total amount due of $362,620.93.  Doc. 1-13 at 1.

[3] In other words, as subsequently found in the Award, Everlast failed "to either pay the delinquency and/or submit appropriate documents supporting a challenge to some or all of the audit findings" within the 14-day period following notice of the delinquency revealed by the Audit.  Doc. 1-15 at 3.

[4] The record does not make clear why Petitioners claimed this precise amount, $365,524.60.

### B.  The Arbitration Proceeding and the Parties' Communications

*1.  April–September 7, 2023 Communications and Hearings*

On April 18, 2023, the Arbitrator issued a Notice of Arbitration Hearing, setting the hearing for May 11, 2023.  Doc. 1-14.  The hearing was adjourned through September 7, 2023 to allow Everlast and its attorney additional time to review and rebut the Audit.[5]  Docs. 22 at 2; 24 ¶ 14.

On May 11, 2023, counsel for Everlast emailed counsel for Petitioners, suggesting that they put their accountants in touch with each other, and requesting a copy of the Audit.  Doc. 13-7 at 9.  Counsel for Petitioners responded within a few hours, providing their auditor's contact as well as the Audit, and stating:

> [A]attached is the audit, including the version with the auditors' notes.  Once we have all the certified payroll matched up with payments + proof of the non-PLA nature of the non-SCA jobs, I think this will be fairly straightforward.  I would really love to have this resolved by the June trustee meeting, but if that's not possible then really no later than the July 13 arbitration date.[6]  Do you think it is reasonable to have everything to the auditors within three weeks?

*Id.* at 8–9.[7]  On May 18, counsel for Petitioners emailed counsel for Everlast again, noting:  "Attached is a spreadsheet of the checks submitted during the Everlast [A]udit [P]eriod and where the hours were applied."  *Id.* at 7–8.

On July 20, 2023, counsel for Petitioners emailed counsel for Everlast, stating: "Please advise whether any rebuttal documents will be submitted or if we will be forced to seek the full balance of the attached audit."  *Id.* at 7.  Counsel for Everlast responded, "I will be out of the office until 7/31, and will respond then."  *Id.* at 6.

---

[5] While the record does not expressly provide whether a hearing was in fact held on May 11, 2023, an email dated August 3, 2023 from counsel for Petitioners to counsel for Everlast implies that it was.  Doc. 13-7 at 4 (August 3 email stating, "there has been no movement since the hearing").

[6] The record does not reflect what the "July 13 arbitration date" refers to, *i.e.* whether there was a hearing, deadline, or other obligation scheduled for that date.

[7] The record does not reflect when or through what means Everlast initially raised his concern that the Audit included non-PLA jobs, as the first mention of that issue on the record is in this May 11 reply email from counsel for Petitioners to counsel for Everlast.  *See* Doc. 13-7 at 11.

On August 3, 2023, having received no response, counsel for Petitioners followed

up on the email chain.  *Id.* at 5–6.  That same day, counsel for Everlast responded:

> I have your e-mail.  Let me get with my client on this, and see where the audit
> stands.  I thought the issues were resolved.  Can you send me an e-mail, as to what
> auditors are saying is still open.  Thx.

*Id.* at 5.  Counsel for Petitioners replied:  "Attached are the prior emails on this matter;

there has been no movement since the hearing.  We need all certified payroll and proof of

the non-PLA nature of the non-SCA jobs."  *Id.* at 4–5.  Still on August 3, counsel for

Everlast stated he would "get back . . . on this asap."  *Id.* at 3–4.

On August 16, 2023, counsel for Petitioners emailed counsel for Everlast to

follow up.  *Id.* at 3.  Counsel for Everlast responded that day:  "I have your e-mail, will

advise asap."  *Id.* at 2–3.

On August 25, counsel for Petitioners emailed:  "Peter – we still have nothing

from your client.  This is back on the hearing schedule for September 7.  We

unfortunately can't contemplate any further adjournments."  Doc. 25-1 at 1.

On September 5, 2023, two days before the scheduled arbitration hearing, counsel

for Everlast wrote:

> Maura, I spoke to my client.  I know we are again before the arbitrator Thursday;
> so, let's see what we can do to resolve this.
>
> As I understand it, the [Everlast] accountant was out and did not get a chance to put
> together the documents.  Anyway, how about this:  We start on a payment plan
> based on your current claim number.  If there is a basis to reduce the principal, if
> we come with the missing documents, we can adjust.  We can keep the arbitration
> open, as a control option.  Please let me know.

Doc. 13-7 at 1–2.  On September 6, 2023, the parties received a calendar invite for the

September 7 arbitration hearing.  Doc. 13-6.  A few minutes thereafter, counsel for

Petitioners responded to the September 5 email from counsel for Everlast, stating:

> Hi Peter - I expect you got my out of office message when you sent the below email
> yesterday.  Sorry for the slight delay in responding**.  We need to hold the
> arbitration unfortunately, but we are open to settlement.  We can ask the
> arbitrator to hold an award in abeyance for two weeks pending formalization
> of a payment plan offer, but it's been too long for us to continue holding off**

> **based on the promise of a future rebuttal (for which we don't even know the basis).**  The company has had months at this point.  Let's plan to see each other on the Teams hearing tomorrow.

Doc. 13-7 at 1 (emphasis added).

The hearing was held virtually on September 7, 2023.  Doc. 1 ¶ 30.  The Arbitrator later provides in the Award issued on October 17, 2023, that, at that hearing, Everlast did not explain or justify its failure to provide documents contesting the Audit or its failure to pay the undisputed delinquencies.  Doc. 1-15 at 5.  Moreover, the Award provides that Everlast did not "contest that, in the absence of the production of such documentation, an Award for the full amount of the audit should be issued."  *Id.*  Nevertheless, it states, Everlast "asked for one more chance"; the Award makes clear that, Petitioners "agreed to ask the Arbitrator to hold the actual issuance of th[e] award in abeyance if by October 1, 2023 [Everlast] both (1) paid $50,000 toward the indebtedness and (2) produced the documents for which the Funds had been asking for months if [Everlast] were going to continue to contest the audit."  *Id.*

However, as further discussed below, Everlast has a different recollection of what was agreed-to at the September 7 hearing; Everlast contends that the parties agreed to "adjourn" the hearing to November 2, and that "the only condition of the adjournment of the 1/2 hour virtual hearing held on September 7, 2023 to November 2, 2023, was a timely $50,000.00 payment on account by October 1, 2023."  Doc. 26 ¶ 18.

*2.  Post-September 7 Hearing Communications*

On September 20, 2023, counsel for Everlast emailed counsel for Petitioners:  "Hi Maura, please advise the way you want Everlast to send the $50,000.00, as agreed."  Doc. 13-8 at 4.

On September 21, the parties exchanged emails concerning line items in the Audit marked with the phrase "unknown locations."  First, counsel for Everlast wrote:

> Hi Maura, my understanding is that the $50G check will be sent next week. Will let you know when sent.

> In discussions with the Everlast accountant, we need more information from your audit person side. Attached is the summary page, with the "unknown locations" highlighted. Where did your client's auditor come to that 2,218.50 number? Please let me know. Everlast accountant is saying that these should be some reference to a job or an address, and without that he cannot understand the claim. There should be more detail, or some reference to a job.
>
> Anyway, please let me know what details your side has, and how they came to this 2,218.50 number.
>
> Thanks, and I will let you know once the check is on its way to you.

*Id.* at 3–4. That same day, counsel for Petitioners responded:

> Those are for hours paid to Union members as evidenced by pay records of a type which inherently do not have projects noted on them (payroll/paystubs, NYS-45, W-2, etc.). Wherever possible, certified payroll records ["CPRs"] produced by Everlast were used to break out delinquencies by job; however, if Everlast did not produce job-specific certified payroll records for given hours worked by Union members, then they went into the "unknown location" category. Whether or not a job is identified or CPRs produced, if Union members are employed then Union benefits must be paid. Everlast is welcome to produce additional CPRs or other job-specific pay records if it has them. The responsibility is on Everlast to maintain such records. I am attaching the "unknown location" hours broken down by member and week if that is helpful; it was previously provided along with the rest of the audit.

*Id.* at 2–3. Counsel for Everlast replied: "Thx., I will see what the accountant and Everlast say. But, how do we know that these are not duplicated for other jobs, if your auditor is only looking at pay stubs for some of these hours??" *Id.* at 1–2. That same day, September 21, counsel for Petitioners responded:

> I'm unsure what you mean. You need only look at the total hours worked by a member in a given week, subtract the hours for which benefits were paid for that member for that week, and make sure the total hours appearing for that member in the audit for that week do not exceed it.
>
> I'll give an example. Regular payroll registers produced by Everlast show that Member X worked a grand total of 24 hours in the week ending 2/14/21. Everlast never paid any benefits for Member X for that week; therefore, all 24 hours are due. Two hours for Member X appear in a CPR for Project A for that week, so those two hours were then put into the basket of unpaid hours for the job specified on that CPR. The other 22 hours may not appear in any of the CPRs produced by Everlast, but Everlast was still employing Member X for those 22 hours (we know this from the payroll register) and the benefits for those hours are due. Those 22 hours thus went into the basket of hours due for "unknown locations."

*Id.* at 1.

### 3.  *October 1–17, 2023 Communications*

By October 1, 2023, Everlast had made the $50,000 payment; however, Plaintiffs state Everlast had still not submitted any rebuttal materials or written disputes regarding the Audit.[8]  Docs. 22 at 3; 25 ¶ 13.

On October 5, 2023, counsel for Petitioners emailed the Arbitrator, requesting that he issue an award without holding an additional hearing on November 2.  She wrote:

> Arbitrator Engelstein,
>
> As you will recall, we agreed that so long as $50,000 and itemized rebuttal were both produced by Everlast by October 1, 2023, we would agree to adjourn to November 2.  However, neither my firm nor the auditors have received any rebuttal.  Therefore, we are asking that you issue an award for the amounts presented at the last hearing, minus a payment on account of $50,000.

Doc. 13-9.  That same day, counsel for Everlast emailed the Arbitrator, opposing Petitioners' request, and stating his belief that only the $50,000 payment was subject to a deadline of October 1.  He wrote:

> Dear arbitrator, the payment was made as promised.  That, counsel does not disclose.  There are issues related to the production of details related to the claim.  I do not recall that there was a cut off date to dispute the substantive issues.  Otherwise, why have an adjournment date if it [is] a formality.  We do not agree that there are no issues to be resolved at the arbitration.  My understanding is that there is an issue related to possibly 10 or 20 percent on the claimed hours.  Accordingly, I believe a conference is appropriate to resolve this issue or misunderstanding.

Doc. 13-10.  Two minutes later, at 2:07 PM, counsel for Petitioners responded to counsel for Everlast:

---

[8] Everlast disputes this characterization.  In an October 18, 2023 letter to the Arbitrator, protesting the Award—which was issued the day prior—counsel for Everlast argued that the Audit *was* disputed.  Doc. 13-12 at 1.  He wrote:

> Specifically, there was and continues to be a dispute as to a number of the projects where Everlast had paid the benefits directly to the employees, that were also included in the audit.  As per attached, there is approximately 2,218.50 hours included in the claimed sum, or a sum of $115,223.74 from the base amount of the award is improper.  I sent an e-mail to counsel on September 21, 2023, attaching this breakdown, and requesting counsel to provide back-up to this calculation, which counsel refused.  My September 21, 2023 e-mail is also attached.  **That somehow counsel now argues that the audit was never disputed is absurd.**

*Id.* (emphasis added).

> Peter, I did disclose it. I said there should be a $50,000 credit for payment on account. We adjourned it with the understanding that the rebuttal would be produced by October 1 in order to 1) give the auditors time to review prior to the next arbitration date and 2) create a strict cut-off in order to stop allowing Everlast to drag its feet as it has been doing for months. I am shocked you don't recall that both needed to be produced by October 1.

Doc. 13-11. A few hours later, counsel for Everlast again emailed counsel for Petitioners

and the Arbitrator, reiterating his understanding that the only condition for the

"adjournment" was the $50,000 down payment. He wrote:

> I have since also spoken to my client. There was an agreement to allow for the Nov 2nd date adjournment, in exchange for the payment of the 50G, as there was an acknowledgment that some sum was due. That was the only condition. There was no other condition. The 50G payment was made.
>
> The accountant is still working on the numbers, and I sent an e-mail to counsel for additional information, on 9/21. If you want to consider this communication as a dispute as to the sum related to unallocated projects, then that is fine.
>
> To be very direct, there appears to be [a] misunderstanding then. No meeting of the minds. The concept was that we would have to Nov 2nd to see if we can resolve this. I don't not want to say more than this, as the concept is to work this out, not to ambush the other side and ask for summary judgment, in essence.
>
> I again ask for a conference on this, or we can discuss this on November 2nd.
>
> All rights reserved.

Doc. 25-2 at 6–7. Within a few minutes, counsel for Petitioners replied to all:

> My contemporaneous notes clearly state otherwise, and I recall everyone very clearly agreeing to the terms I noted. I also provided you with an immediate and detailed response. It's been 2 weeks since then; moreover, they've had 5+ months since this was first noticed. The Funds maintain the position that an award should issue.

*Id.* at 5–6. Counsel for Everlast replied to all, just over an hour later:

> The accountant was away. I know we mentioned this as the reason for the delay and requested adjournment.
>
> There was no agreement as to anything except the money (the 50G) as a condition of keeping these issues open. There was no way to confirm what the accountant could do by what time. So, that your expectation was that you would have his work by the October 1st date, or we default, was never discussed as any condition of you taking a default, in effect. I have also checked the e-mails between us since then, and see nothing regarding any other conditions, except the 50G payment.
>
> Again, I am not saying anything more than that we have here is a misunderstanding. So, I too was shocked today by your application. And, to be direct, before I make

> an application for a default, based on someone not submitting something by a date certain, I make sure to put it in writing and give the other lawyer some prior notice. I just don't see that here.

*Id.* at 4–5.  The emails between the parties, copying the Arbitrator, continued throughout

the evening.  Counsel for Petitioners responded:

> As you are counsel, I expected you would ensure your client complied with the terms of the discussion we had in the presence of the arbitrator.  I do not see how it's my responsibility when a party has counsel to follow up to reiterate the verbal agreement facilitated by the arbitrator and agreed to by all.  The amounts have been due, and the extension through October 1 to produce a rebuttal was itself a courtesy. I am unable to consent to any further concessions, and defer to the arbitrator.

*Id.* at 4.  Counsel for Everlast replied:

> Again, the 50G was paid prior to the October 1st date.  My understanding is (and continues to be) that the Nov date was selected as the next hearing date.  And, I will see what we can do to address the open issues regarding the unallocated projects, prior to that time.  We did not fix any deadlines on that, from my notes.  And, in the same vein, I asked you for information on 9/21, and yes – you responded very quickly that you have no further information about how the auditor picked up these unallocated hours.  So, it seems to me that you were at least on notice that Everlast was objecting to these hours.  What else did you expect from me??  A formal response (e.g. an answer) in arbitration is not the norm, as far as I am aware.  And, again, I do not have any internal notes where it was agreed that there was more to it than the 50G payment, as a condition to the adjournment.

*Id.* at 3.

On October 12, the parties had a final email exchange concerning their dispute as

to whether, as a second condition of holding another hearing on November 2, Everlast

had had to submit rebuttal papers by October 1.  Counsel for Petitioners emailed counsel

for Everlast, copying the Arbitrator:

> In accordance with the agreement made at the arbitration, a specific rebuttal and backup documents were supposed to be received by October 1.  This was in order to allow the auditors time to review.  To date, we have not received any objection or rebuttal with backup documents.  I did receive a general suggestion that Everlast disagrees with some hours.  No hours were identified specifically as being contested and no documentation has been produced in any event.

*Id.* at 2–3.  Counsel for Everlast responded:

> My understanding is that the accountant and client are working on this.  And, yes, if we can get this done prior to the scheduled arbitration in November, we will bring it to you.  Also, note the prior e-mail from me to you, where I asked you for

assistance and you refused to provide further details of the audit, and put all of the burden on the contractor.

*Id.* at 1–2.  Finally, counsel for Petitioners replied:

> For everyone's reference in case it is relevant, the September 21, 2023 email is attached in which I stated that whether or not a job is identified or job-specific CPRs produced, if Union members are employed then Union benefits must be paid.  I said that Everlast is welcome to produce additional CPRs or other job-specific pay records if it has them, but that the responsibility is on Everlast to maintain such records.  The apparent position being is that Everlast is not responsible for hours worked in its employ by Union members unless it provided the auditor with job-specific CPRs for those hours.  Unfortunately, this doesn't hold water.  We have not received any additional documents supporting this position in any event.

*Id.*

On October 12, 2023, the Arbitrator sent an email response, in which he stated he was "duty bound to issue an Award."  *See* Doc. 1-15 at 6.  Addressing the email to counsel for Everlast, the Arbitrator stated that, under the Collection Policy, "[e]mployers have 14 days to present objections to the audit findings which your client [Everlast] apparently did not do."  *Id.* at 5.  The Arbitrator explained that Petitioners had given Everlast months to present its documentation in opposition to the Audit, yet Everlast had not done so, and Everlast had additionally failed to pay the undisputed amounts in the meantime.  *Id.* at 5–6.  The Arbitrator also clarified that the determination at the September 7 hearing had not been to "adjourn" the matter, but rather "to hold the award in abeyance subject to the good faith payment of $50,000 and one final opportunity to present the documentation that should have been presented immediately after the audit and were the inducements to postpone prior hearings."  *Id.* at 6.  In conclusion, the Arbitrator stated:

> I am not sure what the purpose of the conference call would be.  The problem is that your client was given every opportunity to present objections supported by appropriate documentation to the audit findings and has not done so.
>
> I am duty bound to issue an Award.
>
> That being said, if counsel for [the Funds] does not object to a brief conference call sometime Monday or Tuesday, I will try to make myself available.

*Id.* at 6.

4. *The Award*

On October 17, 2023, the Arbitrator issued a seven-page Opinion and Award, accompanied by a "Service Sheet"[9] and an appendix with excerpts from the parties' emails.  Doc. 1-15.

The Award discussed Everlast's obligations under the CBA, the audit process outlined in the Collection Policy, and Everlast's obligations to pay any delinquency or otherwise challenge any audit findings within 14 days of receiving them.  Doc. 1-15 at 1–3.  It also walks through the procedural history of the dispute, including the parties' communications before and after the September 7 hearing.  *Id.* at 3–6.  It notes that Everlast failed to satisfy the delinquency identified by the Audit within the 14-day period, and it also failed to timely challenge the audit.  *Id.* at 3.  Still, it states, "[Petitioners] thereafter gave [Everlast] several opportunities over a more than five-month period to provide the necessary relevant documentation."  *Id.*  The Award highlights that, in the days leading up to the September 7 hearing, Everlast proposed to Petitioners that the parties initiate a payment plan, subject to modification should Everlast produce "the missing documents"; Petitioners responded that while they were willing to request that the Arbitrator hold an award in abeyance for two weeks "pending formalization of a payment plan offer," they would not "continue holding off" on the arbitration just to wait for Everlast to produce its rebuttal documents.  *Id.* at 4.

The Award discusses that at the September 7 hearing, Everlast did not explain or justify its failure to provide rebuttal documents, but rather "asked for one more chance." *Id.* at 5.  It states that Petitioners agreed, "as a courtesy," for an award to be held in abeyance subject to Everlast making *both* a $50,000 payment and a production of documents contesting the Audit by October 1, 2023.  *Id.*  The Award specifies that it was determined that, "[i]f both conditions were not met by October 1, 2023, [Petitioners']

---

[9] Under the heading "Via Email," the Service Sheet lists the name of each party's counsel and a "benefit Fund representative"; under the heading "Via Regular and Return Receipt Certified Mail," the Service Sheet lists "Everlast Scaffolding Inc." with a corresponding address.  *See* Doc. 1-15 at 8.

counsel could request issuance of the Award." *Id.* As to the potential additional hearing

on November 2, the Award provides:

> There was no understanding or agreement to simply adjourn the matter to the next hearing date. Nor would any such agreement make sense. In the absence of the production of documents supporting any challenge to the Audit, the Governing Documents[10] would compel the issuance of an Award and there would be no need for another hearing.

*Id.*

Finally, the Award lays out the Arbitrator's determination and opinion, followed

by the award itself:

> The Governing Documents dictate that, in the absence of a supported colorable objection to the audit findings, I must issue an award based on those findings and the subsequent calculations of accrued interest and other assessments thereon.

> As described above in detail, [Everlast] had more than five months to present evidence that the audit should be adjusted during which time [Petitioners] on several occasions provided copies of the audit, the underlying notes and other materials which would facilitate [Everlast] making such an objection, if there were a basis for doing so.

> [Everlast] has failed to do so and has not raised any other colorable objection to the issuance of an Award.

*Id.* at 7. Accordingly, it awards Petitioners $361,680.82 against Everlast, consisting of

the principal deficiency identified in the Audit of $267,551.83, plus interest, liquidated

damages, promotional fund contributions, attorneys' fees, audit costs, court costs, non-

audit late payment interest, and the arbitration fee, less the "payment on account" of

$50,000 which Everlast had made. *Id.* at 6, 7.

   5. *Post-Award Communications*

   On October 18, counsel for Everlast sent a letter to the Arbitrator, "protest[ing]

the award and the fact that Everlast was denied the opportunity to contest a portion of the

claimed benefits." Doc. 13-12 at 1. In essence, counsel for Everlast argued that "there

was no other condition of the adjournment other than the $50,000 payment that was

---

[10] As used in the Award, the "Governing Documents" include the CBA and the Collection Policy. *See* Doc. 1-15 at 1.

made," and even if there had been a second condition as advocated by Petitioners, Everlast "had in fact disputed the portion of the claimed sum[.]" *Id.* Counsel for Everlast points to his September 21, 2023 email to counsel for Petitioners, in which he attached a "breakdown" of the 2,218.50 hours and $115,223.74 that he contends were improperly included in the Audit, and for which he requested that Petitioners provide more information. *Id.*; *see also* Doc. 13-8 at 3–4.

On October 26, 2023, Petitioners sent Everlast a letter enclosing the Award, and stating: "You are hereby advised that if you do not comply with the Award within seven (7) days of the date hereof, legal proceedings may be instituted against you at any time thereafter without further notice." Doc. 1-16 at 1. The letter is addressed to Everlast via certified mail and email, and to counsel for Everlast via email. *Id.*

As of the date the instant petition to confirm the Award was filed, Everlast has failed to pay any portion of the Award. *See* Doc. 1 ¶ 34.

### C. The Instant Motions

On February 21, 2024, Petitioners filed the instant petition to confirm the Award, Doc. 1, accompanied by various exhibits. On February 26, 2024, Petitioners served Everlast with a summons, the petition, exhibits, including the Award, and other documents, addressing the letter to Everlast via certified mail and email, and to counsel for Everlast via email. *See* Doc. 26-1.

On April 5, 2024, Everlast filed a cross-motion to vacate the Award, Doc. 13. Everlast argues that the Audit included non-PLA projects for which Everlast did not actually owe any payments to Petitioners, and that Everlast "was not afforded the opportunity" to present this defense because the Arbitrator issued an Award without holding a second hearing on November 2, 2023, as contemplated on September 7. Doc. 14 at 4. Everlast contends that "the only condition to adjourn the date [from September 7] to November 2, 2023 was the payment by Everlast by October 1, 2023 of a sum of

$50,000 on account, which was done"; that is, there was not an additional condition that Everlast provide rebuttal documents by October 1, as Petitioners claim.  *Id.* at 2.

Also on April 5, 2024, Everlast filed a Certification by Waleed Khaliq, president of Everlast, accompanied by various exhibits.  Doc. 13-1 ("Khaliq Certification").  The Khaliq Certification discusses Everlast's substantive dispute of the Audit—that a portion of the funds it determined were due to Petitioners was not in fact for jobs for which Petitioners were due any payment.  *Id.* ¶ 10.  Khaliq highlights that the projects with an "unknown location" amount to "a sum of $104,898.26 in claimed principal due for ostensibly 2,218.50 in hours [of work] claimed."  *Id.*; *see also* Doc. 13-2 at 1.  Then, Khaliq points to—and provides documents regarding—six non-PLA jobs that Everlast worked on during the Audit Period, which amounted to an "approximate sum of 1,385 hours" of work.  Doc. 13-1 at ¶ 13; *see* Doc. 13-3.  Khaliq states that "[o]n these jobs, there were no monies due to the Funds[.]"  Doc. 13-1 at ¶ 13.  Therefore, Khaliq argues, "[t]he 2,218.50 in hours calculated by the Funds is not supported because they never identified the jobs" that corresponded to them, whereas "Everlast identifies these jobs."[11] *Id.*  Khaliq claims Petitioners did not provide a basis for how the "auditors calculated the claimed hours for these 'Unknown Location' projects and the $104,898.26 in money it claimed was due and owing."  *Id.* ¶ 15.  Moreover, Khaliq argues the Arbitrator did not provide Everlast with an adequate opportunity to rebut these allegedly unsupported figures, stating:

> For these non-PLA and non-prevailing wage projects . . . Everlast was denied the opportunity to present testimony and documents from its accountant and its principals that would have disputed the findings made by the Fund's accounting for the $104,898.26 amount for the "Unknown Location" projects.
>
> [ . . . ]
>
> Everlast was denied the ability to cross-examine the witnesses that prepared these [audit] documents, relied upon by the arbitrator.

---

[11] Given Khaliq identifies jobs amounting to an "approximate sum of 1,385 hours," it appears he does not account for the full 2,218.50 allegedly unsupported hours identified in the Audit.

*Id.* ¶¶ 14, 15.

## II.    LEGAL STANDARD

The Court's assessment of the instant motions is "governed by section 301 of the

LMRA." *National Football League Management Council v. National Football League*

*Players Association*, 820 F.3d 527, 536 (2d Cir. 2016) ("Because this dispute involves the

assertion of rights under a collective bargaining agreement, [the court's] analysis is

governed by section 301 of the LMRA."); *see also United Brotherhood of Carpenters v.*

*Tappan Zee Constructors, LLC*, No. 14 Civ. 3688 (ALC), 2015 WL 10861108, *5

(S.D.N.Y. Mar. 25, 2015) (alterations in original) (citation omitted) ("[F]ederal courts

indisputably have jurisdiction under section 301 to enforce a labor arbitration award . . .

[and] suits to vacate awards are cognizable under the same statute.").

An arbitration award should be confirmed "if a ground for the Arbitrator's

decision can be inferred from the facts of the case." *D.H. Blair & Co., Inc. v. Gottdiener*,

462 F.3d 95, 110 (2d Cir. 2006) (citation omitted); *see also Burns Int'l Security Services,*

*Inc. v. Int'l Union, United Plant Guard Workers of America (UPGWA) & Its Local 537*,

47 F.3d 14, 17 (2d Cir. 1995).  The Second Circuit has recognized that, in light of the

LMRA's policy preference for dispute resolution through private arbitration, a court's

review of an arbitration award under the LMRA is "very limited."  *National Football*

*League Players Association*, 820 F.3d at 536 (citations omitted) (explaining that "[t]he

LMRA establishes a federal policy of promoting 'industrial stabilization through the

collective bargaining agreement,' with particular emphasis on private arbitration of

grievances," and it "embodies a 'clear preference for the private resolution of labor

disputes without government intervention.'").  Thus, courts do not "review the arbitrator's

decision on the merits," even where there are "allegations that the decision rests on

factual errors or misinterprets the parties' agreement."  *Id.*  Rather, the court "inquire[s]

only as to whether the arbitrator acted within the scope of his authority as defined by the

collective bargaining agreement."  *Id.*  For an award to be confirmed, an arbitrator need

only offer "a barely colorable justification for the outcome reached." *Burns Int'l Security Services, Inc.*, 47 F.3d at 17. Confirmation of a labor arbitration award is thus "a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." *Drywall Tapers & Pointers of Greater New York Loc. Union 1974, IUPAT, AFL-CIO v. Tower Finishing, LLC*, No. 17 Civ. 9153 (GHW), 2018 WL 3242270, at *2 (S.D.N.Y. July 3, 2018) (citation omitted); *see also New York City District Council of Carpenters Pension Fund v. Eastern Millenium Construction, Inc.*, No. 3 Civ. 5122 (DAB), 2003 WL 22773355, at *2 (S.D.N.Y. Nov. 21, 2003).

Generally, "[a] party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high." *D.H. Blair & Co.*, 462 F.3d at 110. Thus, a party seeking vacatur of an Arbitrator's decision "must clear a high hurdle." *Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010). In the LMRA context, "an arbitration award should be upheld as long as it draws its essence from the collective bargaining agreement and is not merely an exercise of the arbitrator's own brand of industrial justice." *Trustees of New York City District Council of Carpenters Pension Fund, Welfare Fund, Annuity Fund, & Apprenticeship, Journeyman Retraining, Educ. & Industry Fund v. Robo Doors & Hardware Corp.*, No. 24 Civ. 37 (JPC), 2025 WL 573770, at *3 (S.D.N.Y. Feb. 21, 2025) (citation omitted). A court's task is to "ensure that the arbitrator was 'even arguably construing or applying the contract and acting within the scope of his authority' and did not 'ignore the plain language of the contract.'" *National Football League Players Association*, 820 F.3d at 537 (quoting *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987)). Courts are not permitted to substitute an arbitrator's view of the facts and meaning of the collective bargaining agreement for their own, as it is "the arbitrator's construction of the contract and assessment of the facts that are dispositive, 'however good, bad, or ugly.'" *National Football League Players*

*Association*, 820 F.3d at 536 (quoting *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 573 (2013)).

## III.    DISCUSSION

Petitioners request that the Court (1) confirm the Award; (2) award Petitioners the $361,680.82 awarded by the Arbitrator, plus interest; (3) award Petitioners $1,906.50 in attorneys' fees and $80 in costs incurred in preparing the instant petition; (4) award Petitioners post-judgment interests; and (5) award Petitioners any other just and proper relief.  Doc. 1 at 9.

Petitioners argue that the Award should be confirmed because the Arbitrator acted within the scope of his authority, and that Everlast's cross-motion to vacate is time-barred.  Everlast argues that its cross-motion to vacate is timely, and that the Award should be vacated because the arbitrator declined to hold a hearing on November 2, 2023 at which Everlast sought to present evidence challenging the Audit.

### A.  Statute of Limitations

The Court first addresses whether Everlast's cross-motion to vacate was timely. Although Congress did not provide a statute of limitations for suits brought under Section 301 of the LMRA, courts in this Circuit have held that a party has 90 days from the receipt of a labor arbitration award to petition for vacatur.  *See, e.g.*, *Orange and Rockland Utilities, Inc. v. Local 503, Int'l Brotherhood of Electrical Workers*, No. 5 Civ. 6320 (WCC), 2006 WL 1073049, at *3 (S.D.N.Y. Apr. 21, 2006).  This 90-day statute of limitations derives from the New York Civil Practice Law and Rules § 7511(a), which provides that "[a]n application to vacate or modify an award may be made by a party within ninety days after its delivery to him." [12]

---

[12] Courts determine the timeliness of a Section 301 suit by looking to the most appropriate state statute of limitations.  *Harry Hoffman Printing, Inc. v. Graphic Communication, Int'l Union, Local 261*, 912 F.2d 608, 612 (2d Cir. 1990).  The Second Circuit has held that CPLR § 7511(a), which provides the grounds for vacating an arbitration award under New York law, provides the most appropriate limitations period for challenging an arbitration award under Section 301 in New York.  *Id.* at 612–13; *see also Local 802, Associated Musicians of Greater N.Y. v. Parker Meridien Hotel,* 145 F.3d 85, 88 (2d Cir. 1998) (same).

Here, Everlast filed its cross-motion to vacate on April 5, 2024. Doc. 13. Petitioners argue that Everlast "was aware of the Award as of at least October 18, 2023"—when counsel for Everlast sent a letter to the Arbitrator protesting the Award, evincing counsel's awareness of the issuance of the Award—and therefore the 90-day mark and deadline for Everlast to move to vacate the Award was January 16, 2024, rendering the April 5 filing untimely. Doc. 22 at 4. Counsel for Everlast concedes that he was aware of the Award on October 18, but argues that his awareness does not satisfy the requirement that the award be "delivered" to "Everlast, as required for the 3-month period to start to run" under § 7511(a). Doc. 26 ¶ 12. Counsel for Everlast argues that the Award was actually "delivered" to Everlast on February 26, 2024—when Petitioners served their summons, petition, exhibits, including the Award, and other documents on Everlast—because that letter was addressed to "both counsel and client Everlast (by Certified Mail)." *Id.* ¶ 13. Therefore, Everlast argues, the 90-day clock began to run on February 26, 2024,[13] not on October 18, 2023, and thus the April 5 motion to vacate was timely. *Id.* ¶¶ 11–13.[14]

Counsel for Everlast does not cite to any authority for the proposition that adequate "delivery" under § 7511(a) requires delivering the Award directly to a party, as opposed to counsel for that party. Petitioners, meanwhile, cite to at least one case in which a party's undisputed awareness of an award was found to suffice for the 90-day clock to begin. *See Trustees of the New York City Dist. Council of Carpenters Pension Fund v. High Performance Floors Inc.*, No. 15 Civ. 0781 (LGS), 2016 WL 3194370, at *3 (S.D.N.Y. June 6, 2016) (emphasis added) ("Although the record is unclear when Respondent *received* the award, it is undisputed that Respondent *was aware* of the award

---

[13] From February 26, 2024, the 90-day statutory period would end on May 26, 2024.

[14] The Court notes that neither party makes any mention of how or when the Arbitrator himself delivered the Award, despite the Award's inclusion of a Service Sheet listing parties' counsel and Everlast itself, *see supra* n.9.

by the time Respondent entered into the stipulation of dismissal without prejudice in the first federal action on March 31, 2014.  Even assuming generously that Respondent did not know of the award until the date of the stipulation, the 90-day statutory period in which it could have petitioned to vacate the award ended on June 29, 2014, at the latest.").  Here, counsel for Everlast concedes that he was aware of the Award by October 18, 2023, the day after it issued, but argues the Award had not been properly "delivered" to his client by that date.  He does not, however, argue—nor does the Court have any basis to assume—that his client was not aware of the Award by the time its counsel sent a letter to the Arbitrator protesting the Award on October 18, Doc. 13-12.

However, even assuming that Everlast was not aware of the Award when its counsel filed the October 18 letter, *and* assuming that the Arbitrator had not delivered the Award to Everlast by that point,[15] the 90-day clock arguably began to run on October 26, 2023, based on Everlast's own rationale.  On October 26, 2023, Petitioners sent Everlast a letter enclosing the Award and demanding compliance with it.  Doc. 1-16.  Like the February 26, 2024 letter, the October 26, 2023 letter was sent by counsel for Petitioners and addressed both to counsel for Everlast, via email, as well as to Everlast itself, via certified mail and email.  *Compare id. with* Doc. 26-1.  Therefore, adopting the argument proffered by counsel for Everlast that the February 26, 2024 letter "delivered" the Award to his client because it was sent to Everlast via certified mail, the letter sent 4 months earlier, on October 26, properly delivered the Award to Everlast as well.  Thus, the 90-day statutory deadline was on January 24, 2024, at the latest, and the April 5 cross-motion to vacate was untimely.  The cross-motion to vacate is denied.

## B.  The Award

Turning to the merits, the Court finds that the Arbitrator acted "within the scope of his authority" in issuing the Award.  *National Football League Players Association*, 820

---

[15] As previously indicated, the Award itself provides for service on Everlast, and on both parties' counsel. *See supra* n.9.  However, it does not certify whether or when that service was actually effected.

F.3d at 536.  The Arbitrator considered Everlast's contractual obligation under the CBA to make certain payments to Petitioners, the audit process laid out in the Collection Policy, and Everlast's obligations under the Collection Policy should it challenge an audit.  He also considered the parties' email communications relating to Everlast's dispute of the Audit, their arguments at the September 7 hearing, and their communications and written submissions following October 1—including Everlast's October 5 communication to the Arbitrator that another hearing should be held to resolve the pending substantive issues regarding the Audit, Doc. 13-10, as well as the parties' back-and-forth about Everlast's misunderstanding over the "adjournment."  Doc. 1-15 at 5; *see also id.* at 10–14 (appending emails between the parties).  Based on these considerations, the Arbitrator plainly acted within the scope of his authority in issuing an Award for Petitioners based on the record at the time, and in declining to hold a hearing on November 2.

To elaborate, first, the Arbitrator had more than a "barely colorable justification" for finding that Everlast failed to adequately dispute the findings of the Audit.  *Burns Int'l Security Services, Inc.*, 47 F.3d at 17.  As an initial matter, the Arbitrator found that Everlast failed "to either pay the delinquency and/or submit appropriate documents supporting a challenge to some or all of the audit findings," within the 14-day period provided for in the Collection Policy.  Doc. 1-15 at 3.  Then, he found that, despite Petitioners nonetheless giving Everlast "several opportunities over a more than five-month period to provide the necessary relevant documentation," Everlast's non-compliance continued.  *Id.* at 3, 4.  The Arbitrator highlighted the parties' email exchange from the two days leading up to the September 7 hearing, whereby Everlast proposed that the parties "start on a payment plan" based on the current figures, subject to adjustment should Everlast produce the "missing documents," and Petitioners responded that they were unwilling to adjourn the hearing "based on the promise of a future rebuttal" that Everlast had "had months at this point" to make, yet they were open to requesting that the

award be held "in abeyance for two weeks pending formalization of a payment plan offer." *Id.* at 4.

The Arbitrator conducted a hearing on September 7, at which Everlast did not explain or justify its failure to provide documents contesting the Audit nor its failure to pay the undisputed delinquencies. *Id.* at 5. Further, the Arbitrator notes, Everlast did not "contest that, in the absence of the production of such documentation, an Award for the full amount of the audit should be issued." *Id.* Nevertheless, Everlast was granted "one more chance"; Petitioners agreed, "as a courtesy," to ask the Arbitrator "to hold the actual issuance of [an] award in abeyance" if Everlast could make the $50,000 down payment and produce the documents necessary for contesting the Audit by October 1, 2023. *Id.* Still, Everlast failed to produce the documentation by October 1. Therefore, the Arbitrator appropriately found that Everlast, despite being given ample opportunity to present evidence that the Audit should be adjusted, did not support its objection to the Audit. *Id.* at 7.

Second, the Arbitrator did not create a "fundamentally unfair" proceeding by declining to hold an additional hearing based on Everlast's failure to produce. *Ottawa Office Integration, Inc. v. FTF Bus. Sys., Inc.*, 132 F. Supp. 2d 215, 220 (S.D.N.Y. 2001) (quoting *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 19 (2d Cir. 1997)) (finding an arbitrator "had good reason to require credible medical evidence before granting another adjournment" where it appeared the respondent "was not as sick as he claimed to be," and providing that "[a]n arbitrator can formulate such procedures as he sees fit as long as the proceedings are not 'fundamentally unfair.'"). Everlast had the opportunity to oppose Petitioners' October 5 request that an award be issued without another hearing, and in his submission to the Arbitrator, Everlast's counsel expressed his belief that only the $50,000 payment—and not the production of documentation—was subject to a deadline of October 1. Doc. 13-10. Having considered that submission, as well as the parties' email discussions regarding their diverging recollections and understandings of what was

25

agreed-upon at the September 7 hearing, the Arbitrator wrote in an October 12 email, consistent with Petitioners' recollection:

> The discussion at the September 7, 2023 hearing was not to adjourn the matter but to hold the award in abeyance subject to the good faith payment of $50,000 and one final opportunity to present the documentation that should have been presented immediately after the audit and were the inducements to postpone prior hearings.

Doc. 1-15 at 6. The Arbitrator explained that he did not see a purpose for another conference, given Everlast's persistent failure to produce documentation, writing: "The problem is that your client was given every opportunity to present objections supported by appropriate documentation to the audit findings and has not done so. I am duty bound to issue an Award." *Id.* Moreover, the Arbitrator explains in the Award that an agreement to simply adjourn the matter to November would not have made sense, as "[i]n the absence of the production of document supporting any challenge to the Audit, the Governing Documents would compel the issuance of an Award and there would be no need for another hearing." *Id.* at 5. In light of Everlast's multiple opportunities to both produce evidence challenging the Audit before October 1, as well as to present arguments to the Arbitrator concerning any procedural disputes, the Court finds that the Arbitrator did not create a fundamentally unfair proceeding by declining to hold another hearing on November 2.

Finally, that Everlast at last produced documentary support for its challenge to the Audit in its April 5, 2024 filings in the instant case does not change the propriety and binding nature of the Award. The CBA confers on the Arbitrator the "full and complete authority to decide any and all issues raised . . . and to fashion an appropriate remedy including, but not limited to, monetary damages." Doc. 1-7 Art XV § 7. The CBA additionally provides that "[t]he arbitrator's award in this regard shall be final and binding upon the parties." *Id.* Therefore, although Everlast now provides documentation to support its challenges to the Audit, *see* Docs. 13-1–13-3, the Arbitrator's determination that Everlast did not substantiate its objections to the Audit, based on the evidence

available at the time, remains unreviewable. *See National Football League Players Association*, 820 F.3d at 536 (courts do not "review the arbitrator's decision on the merits," even where there are "allegations that the decision rests on factual errors[.]"). And, as analyzed above, the Arbitrator aptly considered the parties' contractual obligations, their communications, and their arguments, in determining that Everlast did not provide a "supported colorable objection to the audit findings." Doc. 1-15 at 7. Therefore, the Award clearly "draws its essence from the collective bargaining agreement and is not merely an exercise of the arbitrator's own brand of industrial justice." *Robo Doors & Hardware Corp.*, 2025 WL 573770, at *3 (citation omitted). The Court grants the petition to confirm the Award.

## IV.    CONCLUSION

For the reasons set forth above, Petitioners' motion to confirm the Award is GRANTED, and Everlast's cross-motion to vacate the Award is DENIED.

Petitioners are instructed to submit their fee application and corresponding billing records to the Court by April 8, 2025.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 1 and 13, and close the case.

It is SO ORDERED.

Dated:    March 25, 2025
          New York, New York

_____
EDGARDO RAMOS, U.S.D.J.